# AFFIDAVIT IN SUPPORT OF
# APPLICATION FOR SEARCH WARRANT
## PURPOSE OF AFFIDAVIT

1. I, Gabriel Pedrego, Special Agent (SA) of the Department of Homeland Security (DHS), Homeland Security Investigations (HSI) Tucson, Arizona, being duly sworn, hereby depose and state:

2. I submit this affidavit in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the contents of electronic communication devices capable of accessing the internet, as well as electronic devices with storage capability (**Target Phone 1** and **Target Phone 2**, defined below); and the extraction from **Target Phone 1** and **Target Phone 2** of electronically stored information further described in Attachment B hereto.

3. My knowledge of the facts alleged in this affidavit arise from my training and experience, my personal observations, my participation in the federal investigation described herein, and my review of records obtained during this investigation. As this affidavit is being submitted for the limited purpose of securing a warrant to search **Target Phone 1** and **Target Phone 2**, I have set forth only the facts which I believe are necessary to establish probable cause to search **Target Phone 1** and **Target Phone 2**.

## AGENT'S BACKGROUND

4. Your Affiant is a Special Agent with HSI and has been since October 2010. Prior to October 2010, I was employed as a United States Border Patrol (USBP) Agent from 2003 to 2010.

5. Consequently, I am an "Investigative or Law Enforcement Officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7) and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. As an HSI agent, I retain authority to investigate violations of Title 18, Title 19, Title 21, and Title 31 United States Code.

6. I attended and graduated from the Criminal Investigator Training Program and the HSI Special Agent Training Program, conducted at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia, in 2011. While at FLETC, I received specialized training to include but not be limited to the following areas: narcotics investigations, fraud investigations, cyber investigations, import/export investigations, child pornography investigations, immigration violations and investigations, firearms, defensive tactics, surveillances, and undercover operations.

7. As a Special Agent with HSI, I am responsible for investigating and enforcing violations of federal law, including the enforcement of violations of narcotics laws. I am currently assigned to the Organized Crime Drug Enforcement Task Force Strike Force consisting of Special Agents from Homeland Security Investigations, the Drug Enforcement Administration, the Federal Bureau of Investigation, the Bureau of

Alcohol, Tobacco, Firearms and Explosives, and other federal, state, and local law enforcement agencies. The task force is responsible for investigating crimes including but not limited to narcotics smuggling, weapons smuggling and money laundering. During the course of my training and experience, I have become familiar with the practices and operations of narcotics smugglers and traffickers.

8. While employed in federal law enforcement, I have coordinated and worked with experienced local, state, and other federal law enforcement officials regarding various types of criminal violations. I have taken part in numerous investigations of individuals who have violated federal laws, particularly laws found in the United States Code Title 8, 18, and 21. I have conducted physical and electronic surveillance, executed search warrants, and reviewed documents and records of drug and illegal alien traffickers.  I have interviewed confidential sources of information as well as cooperating individuals as to how drug trafficking and smuggling organizations operate.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

9. The electronic communication devices to be examined are described as the following:

    a. One (1) Apple iPhone cellular phone, (hereinafter referred to as "**Target Phone 1**")

    b. One (1) LG cellular phone, (hereinafter referred to as "**Target Phone 2**")

10. The **Target Phones** to be searched pursuant to the attached application are further described in Attachment A hereto.

11. **Target Phone 1** was seized on April 20, 2022, from Enrique FLORES-Diaz (hereinafter referred to as FLORES). **Target Phone 2** was seized on April 20,2022, from Pilar LEON Beltran (hereinafter referred to as LEON). **Target Phone 1** and **Target Phone 2** are currently being stored as evidence at the HSI office in Tucson, Arizona.

## BACKGROUND ON SMARTPHONES

12. Based upon my knowledge, training, and experience, as well as information related to me by other law enforcement officers and others experienced in the forensic examination of electronic communication devices, I know that certain types of cellular telephones referred to as "smartphones" (such as **Target Phone 1** and **Target Phone 2**) generally offer more advanced computing ability and internet connectivity than standard cellular telephones. Provided that internet access has been purchased through an electronic communication service provider for a particular smartphone, or has connected to a wireless network, a smartphone is capable of running complete operating system software, has full access to the internet and/or electronic mail (including file attachments), is capable of text and instant messaging, can create and edit documents created with computer software, is capable of storing large amounts of data, and can be interfaced with desktop and laptop computers.

13. As described in Attachment B hereto, this affidavit seeks permission to locate not only data files that might serve as direct evidence of the crimes described in the warrant, but also for evidence that establishes what individual(s) used **Target Phone**

**1** and **Target Phone 2** as well as the purpose of its use. Additionally, this affidavit seeks information about the possible location of other evidence.

14. As described in Attachment B hereto, this affidavit also seeks permission to search and seize certain electronic records that might be stored within **Target Phone 1** and **Target Phone 2**. Some of these electronic records might take the form of files, documents, or other data that are user generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

15. Although some of the records requested in this affidavit might be found in the form of user-generated documents (such as electronic format documents and picture and movie files), electronic communication devices (such as **Target Phone 1** and **Target Phone 2**) can contain other forms of electronic evidence that are not user-generated. In particular, electronic communication devices may contain records of how it has been used and/or the person(s) who utilized the electronic communication device. Based upon my knowledge, training, and experience, as well as information related to me by law enforcement officers, and other persons involved in the forensic examination of electronic communication devices, I know that:

    a. Data on electronic communication devices not currently associated with any file can provide evidence of a file that was once on the electronic communication device, but has since been deleted or edited, or of a deleted portion of a file;

5

b. Virtual memory paging systems can leave traces of information on an electronic communication device that can be used to determine what tasks and processes were recently in use;

c. Web browsers, e-mail programs, social media platforms, and chat programs store configuration information on the electronic communication devices that can reveal information such as online nicknames and passwords;

d. Operating systems can record additional information, such as the attachment of peripheral electronic devices, and the number of occasions on which the peripheral electronic devices were accessed;

e. Computer file systems can record information about the dates that files were created and the sequence in which they were created. This information may be evidence of a crime and/or indicate the existence and/or location of evidence in other locations on the electronic communication device;

f. When an electronic communication device has more than one user, files can contain information indicating the dates and times that the files were created as well as the sequence in which the files were created, and whether a particular user accessed other information close in time to the file creation dates, times, and sequences;

g. The types of evidence described above may be direct evidence of a crime, indirect evidence of a crime indicating the location of evidence

    or a space where evidence was once located, contextual evidence identifying an electronic communication device user, and contextual evidence excluding an electronic communication device user. All of these types of evidence may indicate ownership, knowledge, and intent to commit a given offense; and

    h.  The foregoing type of evidence is not "data" that can be segregated, that is, this type of information cannot be abstractly reviewed and filtered by a seizing or imaging agent and then transmitted to investigators. Rather, evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how electronic communication devices operate and how electronic communication devices are used. Therefore, contextual information necessary to understand the evidence described in Attachment B hereto also falls within the scope of the warrant.

## CHARACTERISTICS OF INDIVIDUALS INVOLVED IN DRUG-TRAFFICKING ORGANIZATIONS

16. Based upon my knowledge, experience, and training in drug trafficking organization (DTO) investigations, as well as the training and experience of other law enforcement officers with whom I have had discussions, I know that there are certain characteristics common amongst individuals involved in DTOs. Individuals involved in drug-trafficking activity tend to:

a. Retain records pertaining to financial transactions and the persons for whom the transactions are being conducted;

b. Collect data pertaining to other co-conspirators involved in drug-trafficking activity, including drug types and quantities provided, as well as monies owed and/or paid for illegal controlled substances;

c. Possess and maintain records reflecting bank transactions and/or money transfers;

d. Maintain collections of records that are in a digital or electronic format in a safe, secure and private environment, including electronic communication devices (such as the Target phone). These records are often maintained for several years and are kept in close proximity to the drug-trafficker/cash-smuggler, usually at the individual's residence, to enable the drug-trafficker to review the records, which are highly valued;

e. Correspond with and/or meet with other drug-trafficking associates to share drug-trafficking/cash-smuggling information and/or materials;

f. Retain correspondence from other drug-trafficking co-conspirators relating to drug-trafficking/cash-smuggling activity;

g. Maintain lists of names, addresses, and/or telephone numbers of individuals with whom the drug-traffickers have been in contact and/or conducted drug-trafficking activity;

h. Use multiple telephones for communication with coordinators, scouts and other drug-trafficking co-conspirators. Many of these phones are more commonly known as "burner phones." These "burner phones" are used almost exclusively in the commission of the drug-trafficking crime, specifically to call other co-conspirators to discuss the arrangements, which include the pick-up and drop-off of the illegal drugs. "Burner phones" are used to mask or conceal the identity of the actual user/owner and to provide a way to compartmentalize the user/owner's illicit activity. These "burner phones" are usually inexpensive and used for a brief and limited period of time until discarded. In addition, the "burner phones" are often discarded once the user/owner suspects any law enforcement activity;

i. Use multiple telephones for communication with coordinators, scouts and other drug-trafficking co-conspirators. On many occasions, the principal subject will also have a personal telephone in their possession. The personal phone will have a history of phone calls, or text messages, with other subjects involved in the drug-trafficking conspiracy, as the principal subject is usually introduced into the conspiracy through social contacts. These conversations will occur prior to and after the smuggling attempt. These will often be saved by the user/owner of the phone. Additionally, principles have been known to use Facebook, messaging, WhatsApp, Telegram, or other third-party social media

9

messaging applications. The personal cell phone often will have the identities of additional co-conspirators saved in the contact log.

## PROBABLE CAUSE

17. In March 2022, HSI received information from a confidential informant (CI) regarding an individual named "Enrique", who was coordinating the sale of fentanyl-laced pills which are smuggled from Mexico into the United States. The CI informed agents that "Enrique" was looking for buyers of the fentanyl pills in the Tucson and Phoenix, AZ areas. The CI provided phone number (623) 274-9396 for "Enrique", which is the number for **Target Phone 1** and the number used for all communications between the CI and "Enrique". With the approval of agents, the CI informed "Enrique" that he/she would be willing to make an initial purchase of approximately 5,000 fentanyl pills and would purchase a larger amount if the initial deal worked out.

18. On March 24, 2022, HSI and Arizona Department of Public Safety (DPS) initiated surveillance at a parking lot in Tucson, AZ in anticipation of a buy/walk operation in which the CI agreed to buy 5,000 fentanyl pills from "Enrique" for a price of $4,500. At approximately 1500 hours, agents observed "Enrique", who was later identified as Enrique FLORES-Diaz, enter the CI's vehicle where FLORES handed the CI a bag containing approximately 5,000 fentanyl pills in exchange for cash payment. Agents also observed an individual later identified as Pilar LEON-Beltran standing nearby who appeared to be acting as a lookout for FLORES. After the exchange, agents observed FLORES exit the vehicle, enter a nearby laundromat, then exit the

laundromat and stand alongside LEON. The pills were seized and processed at the DPS station which totaled 466 grams and field tested positive for fentanyl.

19. On April 20, 2022, HSI and DPS initiated surveillance at a parking lot in Scottsdale, AZ in anticipation of a buy/bust operation in which the CI agreed to buy 200,000 fentanyl pills from FLORES. At approximately 1720 hours, FLORES arrived at the parking lot as the driver of a blue Nissan Sentra with Laura Elena HAMBRICK as the passenger. The CI confirmed the presence of fentanyl pills located inside a duffel bag on the rear seat of the blue Nissan Sentra and instructed FLORES to follow him/her to a nearby residence to complete the drug deal. At approximately 1730 hours, the blue Nissan Sentra departed the parking lot and DPS officers initiated a stop on the vehicle. After a search of the vehicle, officers located 9 packages of pills inside the duffel bag and one bag near the driver's side door. The pills were processed at the DPS station which totaled 4.99 kilograms and field tested positive for fentanyl.

20. At the scene of the traffic stop, HAMBRICK informed HSI and DPS that a white Mazda sedan containing additional fentanyl pills was located nearby and was occupied by a male and female. HAMBRICK stated she was willing to contact the male and have him bring the additional fentanyl pills. Agents then observed HAMBRICK use her cellular phone to contact the male, later identified as LEON, at phone number (520) 475-7927, which is the phone number for **Target Phone 2**. HAMBRICK instructed LEON to drive to her location and park behind the blue Nissan Sentra. Upon arrival of the white Mazda sedan, DPS officers initiated a traffic stop on the vehicle and encountered Denisse CALDERON-Razura as the driver and

LEON as the passenger. After a search of the vehicle, officers located approximately 50 bags of pills inside of an ice chest on the rear seat and a Glock 43 handgun under the front passenger seat where LEON was seated. The pills were seized and processed at the DPS station which totaled 5.62 kilograms and field tested positive for fentanyl.

21. In a subsequent interview at the DPS station, CALDERON made the following post-Miranda statements to agents and officers.

22. On April 18, 2022, while at her residence in Tucson, CALDERON was contacted by FLORES, who invited her to travel to Phoenix with FLORES, LEON, and HAMBRICK to conduct a drug deal. FLORES informed CALDERON she would drive her vehicle, a white Mazda 3, and that LEON would accompany her. FLORES also stated he would travel to Phoenix in a separate vehicle with HAMBRICK.

23. On the afternoon of April 19, 2022, CALDERON, LEON, FLORES, and HAMBRICK all departed Tucson and traveled to a bus station in Phoenix where LEON met with and received a "sample" of approximately 10 fentanyl pills from a male driving a black Dodge Charger. LEON then gave the "sample" of ten fentanyl pills to FLORES who was to take them to the "buyer's helper". CALDERON, LEON, FLORES, and HAMBRICK later met at a hotel in Phoenix, where HAMBRICK booked two rooms and all four stayed overnight. One room was booked for CALDERON and LEON, and one for FLORES and HAMBRICK.

24. While in Phoenix, CALDERON overheard LEON's phone conversation with FLORES, in which LEON told FLORES that the supplier did not have the 280,000 pills, they only had 100,000, and that LEON would have to find other suppliers.

LEON had contact with the suppliers and FLORES had contact with the buyer. CALDERON and LEON traveled to a restaurant called "Rita's", in west Phoenix where LEON met with and received a "sample" of 1,000 fentanyl pills. CALDERON and LEON then traveled to a Walgreens in Glendale, AZ, where LEON met with and received an additional 39,000 fentanyl pills in a white laundry bag from the same male from "Rita's". LEON then gave the 1,000 and 39,000 fentanyl pills to FLORES who was to take them to the buyer in Scottsdale.

25. CALDERON and LEON later met with a male in a white Honda near a residence located at 2801 N 64th Dr, Phoenix. The male took an ice chest out of the trunk of the white Honda and put it in CALDERON's Mazda 3. FLORES then instructed LEON and CALDERON to travel to Scottsdale and wait for further instructions.

26. After CALDERON and LEON waited at a parking lot in Scottsdale for some time, LEON received a call from HAMBRICK and received instructions to deliver the additional fentanyl pills to a residence nearby. CALDERON and LEON traveled to the residence and were pulled over by DPS units upon arrival.

27. I know, from training and experience, that drug couriers utilize cellular phones, including smart phones such as **Target Phone 1** and **Target Phone 2**, to communicate with drug smuggling coordinators and co-conspirators prior to, during, and following drug smuggling operations. I know that drug smuggling coordinators contact the couriers frequently during drug smuggling ventures to ensure the drugs have not been seized by law enforcement, and to give the couriers follow up instructions and drop of locations for the drugs.

28. I also know from training and experience that drug couriers often utilize mapping applications on their smart phones to direct them to locations where co-conspirators load the courier and/or their vehicles with drugs, and to direct them to locations where the couriers are instructed drop the drugs off.

29. I submit that there is probable cause to believe that the **Target Phones** requested to be searched may contain evidence identifying: (1) cellular telephone numbers used by drug-trafficking associates; (2) telephone calls conducted with drug-trafficking co-conspirators (to include time, date, and duration of calls); (3) photographs of and/or with drug-trafficking co-conspirators, illegal controlled substances, and/or bulk illicit currency; (4) text and/or voicemail message communications (including time and date) with drug-trafficking associates; (5) electronic mail and social media internet sites accessed by the users of **Target Phone 1** and **Target Phone 2**; and (6) usernames and/or passwords utilized by the users of **Target Phone 1** and **Target Phone 2** to access electronic mail and social media internet sites.

30. Based on my training and experience, as well as the training and experience of other law enforcement officers participating in this investigation, I know that DTOs utilize cellular telephones (such as **Target Phone 1** and **Target Phone 2**) to communicate when conducting their illegal activity, utilizing voice, text, and electronic mail (if accessible) functions of the cellular telephone to do so. These devices are utilized in furtherance of the crime via the coordination of transport and distribution of controlled substances, the collection and movement of bulk illicit currency, as well as communication with members of the DTO about the specific operations of that DTO.

## ADVANCED DIGITAL DATA EXTRACTION REQUEST

31. This warrant provides authorization for law enforcement officers of HSI Tucson or their designee to search the above-listed devices and/or associated peripheral equipment, including by way of example but not limitation, subscriber identity module (SIM) card(s), removable storage media, and/or paired or synced devices, for the evidence listed in the affidavit and warrant using a range of data analysis techniques. However, in some cases, the cellular communication devices may be damaged beyond repair, password-protected or otherwise inoperable and less invasive data analysis techniques will not accomplish the forensic goals of the examination. In these cases, an analysis technique referred to as "chip-off" may be implemented to conduct the data extraction process. Chip-off is an advanced digital data extraction and analysis technique which involves physically removing flash memory chip(s) from a subject device and then acquiring the raw data using specialized equipment. This process renders the cellular communication device unusable.

32. I am respectfully requesting authorization to conduct an advanced digital data extraction technique, more commonly known as a "chip-off," of the above-listed devices in the event and only after less invasive traditional data analysis techniques fail.

## CONCLUSION

33. Based upon the foregoing, I believe that probable cause exists to search the aforementioned **Target Phone 1** and **Target Phone 2** for the items set forth in Attachment B hereto. I believe that **Target Phone 1** and **Target Phone 2** contain

15

evidence relating to the commission of criminal offenses, which are, Conspiracy to Possess with Intent to Distribute Fentanyl, in violation of Title 21, United States Code, Sections 846, 841, Distribution of Fentanyl and Possession with Intent to Distribute Fentanyl in violation of Title 21, United States Code, Section 841, Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of Title 18, United States Code, Section 924, and as well as constitutes property designed for use, intended for use, or used in committing the aforementioned crime.

34. **Target Phone** 1 and **Target Phone 2** have been in the possession of HSI since their seizure. Due to the nature of such electronic devices, data contained within will remain uncorrupted when being stored for long periods of time. I respectfully request that a warrant be issued, allowing for the search of **Target Phone 1** and **Target Phone 2** as described above.

Respectfully, submitted this 3rd day of June, 2022.

GABRIEL C PEDREGO
Digitally signed by GABRIEL C PEDREGO
Date: 2022.06.03 08:47:56 -07'00'

Gabriel Pedrego
Special Agent
Homeland Security Investigations

Subscribed and sworn to telephonically this ___3rd___ day of June, 2022.

Hon. Eric J. Markovich
United States Magistrate Judge